PENNSYLVANIA RAILROAD CO. ET AL. *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL.

No. 746. Argued April 7, 8, 1936.—Decided April 27, 1936.

*Messrs. Frederic D. McKenney* and *Guernsey Orcutt,* with whom *Messrs. Leo P. Day* and *John J. Fitzpatrick* were on the brief, for appellants.

*Messrs. August G. Gutheim* and *Donald C. Power,* with whom *Mr. John W. Bricker,* Attorney General of Ohio, ·was on the brief, for the Ohio appellees.

*Mr. Don Rose* for Pittsburgh Coal Co., appellee.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

·An order of the Public Utilities Commission of Ohio. directs the Pennsylvania Railroad Company and the Erie Railroad Company, appellants in this court, to adhere to local or intrastate rates in switching and delivering four carloads of bituminous coal to consignees in Youngstown, Ohio, and in switching and delivering any other carloads that may be tendered hereafter in similar conditions. The question is whether the effect of such an order ·as applied to the transactions exhibited in the record is to regulate common carriers by rail in the business of interstate transportation, and thus to trench upon the jurisdiction of the Interstate Commerce Commission.

Pittsburgh Coal Company, an appellee in this court, is the owner of coal mines in Pennsylvania, so situated that the product of the mines can readily be conveyed by use of the owner's cars and tipple to barges waiting to receive it on the Monongahela River. Much of the coal is sold to consumers in Ohio. The company has its own barges in which the coal is towed by its own tug boats, first over the Monongahela River and then over the Ohio, to Smith's Ferry, Pennsylvania. There it has its own right of way, with tracks and cars and engine. The coal, when transferred from the barges to the cars, is taken over this right of way, a distance of about eleven miles, to Negley, Ohio. At Negley, or near by, is the

Brush River Plant, owned by the coal company, where the coal is dumped from the cars, washed, freed from foreign matter and impurities, and broken up or assorted into the sizes desired by the customers. Then for the first time it is ready for shipment to fill specific orders, which often are not received until after it has left the mines. Up to that point the carriage has been solely by a private carrier, making use of its own facilities, its trains and tugs and barges.

At Negley the coal after being put in shape for sale is loaded upon the cars of the Pittsburgh, Lisbon and Western Railroad Company, referred to in the record as Lisbon, for transportation to consignees at Youngstown or elsewhere. Lisbon is a common carrier by rail, which connects at Signal, Ohio, with the tracks of the Youngstown and Suburban Railroad Company, referred to in the record as the Y. & S. The route of that line, about 22.2 miles, is between Signal and Youngstown, where there are interchange facilities with the Pennsylvania and the Erie.

On September 17, 1934, Lisbon received from the Pittsburgh Coal Company at Negley four carloads of bituminous coal to be transported via the Y. & S. to Youngstown, the cars to be there transferred, first to the Pennsylvania and then to the Erie, for delivery to consignees in Youngstown identified in the shipping orders. Lisbon and Y. & S. followed these instructions. Upon tender of the cars at the proper interchange track, Pennsylvania refused to accept or switch them except upon payment of the road haul charges on file with the Interstate Commerce Commission. The switching rates prescribed by the State Commission were $7.65 per car, a charge which covered the intermediate service of the Pennsylvania and the delivery service of the Erie. No switching rates for such traffic had been filed with the federal Commission by any of the trunk lines, but the haul charges, calcu-

lated to the next destination beyond, were $94.50 per car. Upon the rejection of the four carloads the Pennsylvania gave written notice to the Y. & S. that thereafter carloads of bituminous coal from mines outside Ohio would not be accepted for delivery within the Youngstown switching limits until all charges were prepaid at rates published in the tariffs on file with the federal Commission.

Following the receipt of this notice, the Y. & S. filed with the Ohio Commission its complaint against the Pennsylvania and the Erie, the two companies having acted in concert in demanding the higher rates. Other lines, including the Baltimore & Ohio Railroad Company, and the Pittsburgh and Lake Erie Railroad Company, intervened in the proceedings, as did also the Pittsburgh Coal Company. After a full hearing the Commission held in a careful opinion that in the circumstances stated the State of Ohio had jurisdiction by its Commission to regulate the charges for switching services at Youngstown, and that the rates thereby prescribed were binding on the carriers. An order was made accordingly. This order was sustained by a District Court of three judges, application having been made for relief by injunction both interlocutory and final. Judicial Code § 266; 28 U. S. C. § 380. The case is here upon appeal. *Ibid.*

*First:* The transportation of the coal from Negley, Ohio, to Youngstown in the same state, was an intrastate service, not subject to the provisions of the Interstate Commerce Act, and its character in that regard was not changed because of preliminary carriage from the Pennsylvania mines in barges and cars belonging to the shipper.

Appellants say that from the moment the coal left the mines in Pennsylvania there was a continuing intention to deliver it to consumers in another state, whether their identity at the beginning was known or unknown, and

174

that a movement impelled by that intention is interstate commerce which Congress has the power to regulate at any stage of the ensuing transit. *Baltimore & Ohio S. W. R. Co.* v. *Settle,* 260 U. S. 166, 173; *Ohio Railroad Comm'n* v. *Worthington,* 225 U. S. 101, 108; *Federal Trade Comm'n* v. *Pacific States Paper Assn.,* 273 U. S. 52, 64. But there is confusion of thought in such a statement of the problem. Not all commerce is transportation, and not all transportation is by common carriers by rail. The question for us here is not whether the movement of the coal is to be classified as commerce or even as commerce between states. The question is whether it is that particular form of interstate commerce which Congress has subjected to regulation in respect of rates by a federal commission. The Interstate Commerce Act (49 U. S. C. § 1 *et seq.*) is aimed at common carriers exclusively, § 1 (1), (3), and not even at all these. With exceptions plainly unrelated to this case, § 1 (1) (b), (c), carriers, even though common, are unaffected by the act unless they are carriers wholly by railroad, or if partly by railroad and partly by water, are operating under "a common control, management, or arrangement for a continuous carriage or shipment." § 1 (1) (a). Cf. *Cincinnati, N. O. & T. P. Ry. Co.* v. *Interstate Commerce Comm'n,* 162 U. S. 184; *Louisville & N. R. Co.* v. *Behlmer,* 175 U. S. 648; *Standard Oil Co.* v. *United States,* 179 Fed. 614; *Mutual Transit Co.* v. *United States,* 178 Fed. 664. There are limitations, moreover, in respect of the conduct to be controlled in addition to the foregoing limitations in respect of the carriers to be regulated. Even though the activities are those of common carriers by rail, the statute does not apply "to the transportation of passengers or property . . . wholly within one State and not shipped to or from a foreign country from or to any place in the United States." § 1 (2) (a), (b). For many purposes, as for example in testing the validity of state taxation, merchandise is deemed

to be in interstate commerce when it has started on its journey, though still in the possession of consignor or seller. *Hughes Bros. Co.* v. *Minnesota,* 272 U. S. 469, 475; *Champlain Realty Co.* v. *Brattleboro,* 260 U. S. 366. Not so, however, in determining the application of this act. Transportation begins for that purpose, if not for others, when the merchandise has been placed in the possession of a carrier. *Hughes Bros. Co.* v. *Minnesota, supra; Coe* v. *Errol,* 116 U. S. 517, 528; *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82, 95; *Southern Pacific Terminal Co.* v. *Interstate Commerce Comm'n,* 219 U. S. 498, 527. And "wherever the word 'carrier' is used in this chapter it shall be held to mean 'common carrier.'" § 1 (3).

With the aid of these definitions the problem before us takes on a new simplicity. The only transportation of this coal by a common carrier of merchandise either by railroad or by water was intrastate transportation in Ohio between Negley and Youngstown. The transportation between Pennsylvania and Ohio was by the owner, who was not a common carrier, but furnished implements of carriage for its own use exclusively. Appellants would have us hold that this interstate transportation by an owner who does not carry for any one else will be tacked to the intrastate transportation by railroads who are in business as common carriers, and the movement thus consolidated brought within the statute. The statute and the decisions as we read them forbid this unifying process. *The Pipe Line Cases,* 234 U. S. 548, 562; *McCluskey* v. *Marysville & Northern Ry. Co.,* 243 U. S. 36, 39, 40; *Atlantic Coast Line R. Co.* v. *Standard Oil Co.,* 275 U. S. 257; *Campbell River Mills Co.* v. *Chicago, M., St. P. & P. R. Co.,* 42 F. (2d) 775, 777, 778; aff'd, 53 F. (2d) 69, 72, 73; *Pennsylvania R. Co.* v. *McGirr's Sons Co.,* 287 Fed. 334.

Two cases in this court (*United States* v. *Erie R. Co.,* 280 U. S. 98, and *Texas & New Orleans Ry. Co.* v. *Sabine*

*Tram Co.*, 227 U. S. 111) are put forward with special emphasis by appellants as supporting a different conclusion.

Of these, the first had to do with a shipment of wood pulp imported from abroad to Hoboken, New Jersey, where the merchandise was to be transshipped by rail to Garfield in the same state. The haul from Hoboken to Garfield was held to be subject to regulation by the federal Commission. The case differs from the one at hand in at least three particulars: (1) the carriage to Hoboken, as will appear from an examination of the record, was effected by a common carrier; (2) the ultimate consignee was known from the beginning; (3) the rail transportation was "in fact a part of foreign commerce." 280 U. S. at p. 102. Upon a shipment of merchandise to or from a foreign country, the Interstate Commerce Act applies to the carriage in this country, though that part of the carriage is within the limits of a single state. § 1 (1) (c), (2) (a). Cf. *Denver & Rio Grande R. Co.* v. *Interstate Commerce Comm'n,* 195 Fed. 968, 972; *Oregon-Washington R. & N. Co.* v. *Strauss & Co.,* 73 F. (2d) 912; Lees & Sons Co. v. Reading Co., 148 I. C. C. 603; In re Transportation of Sugar, 22 I. C. C. 558.

*Texas & New Orleans Ry. Co.* v. *Sabine Tram Co., supra,* though differing in details from the case of the Erie Railway, illustrates the same principle, and is to be distinguished on like grounds.

Neither in the cases cited by the appellants nor in any others known to us has transportation by a common carrier been combined with carriage by an owner for the purpose of subjecting the whole to the operation of the statute when the parts would be exempt. Such a fusion, if permitted, would lead to strange results. The situation laid before us would not be changed in its essentials if a coöperative association of farmers doing business in Pennsylvania close to the state line were to use a fleet of trucks belonging to the association or its members to

carry milk or vegetables from Pennsylvania to a railroad station in Ohio. Even though this were done systematically and not casually or in sporadic instances, the ensuing transportation by rail, if kept within Ohio, would not be transportation between the states within the meaning of the Act of Congress. If the concept of transportation is in need of expansion, it is for the legislative department of the government to determine how great the change shall be.

We have found it unnecessary to consider in the disposition of the case whether the treatment of the coal at Negley would break the continuity of the movement from the mines, even if interstate transportation would otherwise exist. Cf. *Southern Pacific Terminal Co.* v. *Interstate Commerce Comm'n, supra,* at p. 526; *Alabama Great Southern R. Co.* v. *McFadden & Bros.,* 232 Fed. 1000; aff'd, *McFadden & Bros.* v. *Alabama Great Southern R. Co.,* 241 Fed. 562; *Board of Trade of Chicago* v. *Olsen,* 262 U. S. 1, 33; *Arkadelphia Milling Co.* v. *St. Louis S. W. Ry. Co.,* 249 U. S. 134, 151, 152; *General Oil Co.* v. *Crain,* 209 U. S. 211.

*Second:* The appellants have woven into their brief a suggestion, not contained in their statement of points relied upon for reversal, that the ownership by the coal company of a controlling interest in the shares of the Lisbon and the Y. & S. has a bearing on the nature of the transit between Negley and the mines. There is insinuation, if not argument, that in building and operating a private right of way the coal company has nullified restraints imposed upon the railroads by the federal Commission, and for that reason must be treated as if it were a common carrier itself.

No such point was made in the complaint, nor do the assignments of error present it adequately here.

The decree should be affirmed, and it is so ordered.

*Affirmed.*