L. A. TUCKER TRUCK LINES, INC., and Public Service Commission, State of Missouri, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

Daniel Hamm Drayage Company, Inc., and Universal Atlas Cement Division, United States Steel Corporation, Intervenor Defendants.

No. 62 C 281(2).

United States District Court
E. D. Missouri, E. D.

March 11, 1963.

LaTourette & Rebman, G. F. Gunn, Jr., St. Louis, Mo., for L. A. Tucker Truck Lines, Inc.

Glen D. Evans and Thomas J. Downey, Jefferson City, Mo., for Public Service Commission, State of Missouri.

John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Francis A. Silver, Assoc. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., for defendants.

Ernest A. Brooks, II, St. Louis, Mo., for intervenor Daniel Hamm Drayage Co., Inc.

Nelson Hartman, St. Louis, Mo., for intervenor Universal Atlas Cement Div.

Before MATTHES, Circuit Judge, and MEREDITH and REGAN, District Judges.

262

PER CURIAM.

This is an action to review, enjoin, set aside, and suspend a portion of an order of December 29, 1961, issued by the Interstate Commerce Commission, granting a Certificate of Public Convenience and Necessity to Daniel Hamm Drayage Company, Inc., to operate in interstate or foreign commerce as a common carrier by motor vehicle over irregular routes for the purpose of hauling cement from the site of the plant of Universal Atlas Cement Division of United States Steel Corporation at St. Louis, Missouri, to statewide points in Illinois and Missouri. On May 24, 1962, the Interstate Commerce Commission denied the separate petitions of plaintiff L. A. Tucker Truck Lines, Inc., and plaintiff-intervenor Public Service Commission, State of Missouri, for reconsideration. In accordance with the provisions of the Interstate Commerce Act, 49 U.S.C.A. §§ 17(9), 305(g), 305(h), plaintiffs proceeded here. Jurisdiction of the subject matter and the parties is present under Title 28 U.S.C.A. §§ 1336, 1398, 2284, 2321 through 2325, inclusive, and the Administrative Procedure Act, Title 5 U.S.C.A. § 1009.

On January 30, 1961, Hamm filed with the Interstate Commerce Commission, hereinafter referred to as the ICC, an application for a Certificate of Public Convenience and Necessity for authority to operate in interstate and foreign commerce as a common carrier of cement, in bulk, bags and packages, by motor vehicle over irregular routes from the plant site of Universal Atlas in St. Louis, Missouri, to Illinois and Missouri, ICC Docket No. MC–42963 (Sub No. 12). The application was referred to Joint Board No. 135, composed of representatives of the States of Illinois and Missouri. There was a hearing before the Joint Board on April 27, 1961, and on July 20 and 21, 1961. Universal Atlas appeared as the sole supporter of the application. Numerous carriers, including plaintiff Tucker, opposed the application.

"In view of the lack of receiver support, the pendency of previously filed applications by Commercial and Ee-Jay (protestant motor carriers not before the Court) and the presently available motor carrier and rail service", the Joint Board found that public convenience and necessity did not require the operation for which authority was sought and recommended that the application be denied.

Exceptions to the Joint Board's report and recommended order were filed by Hamm and Universal Atlas on December 29, 1961. The ICC, Division No. 1, adopted the Joint Board's statement of facts, but not its recommendation. It found that subsequent to the Joint Board's hearing, Commercial and Ee-Jay were granted authority to transport bulk cement from plant sites at St. Louis and Hannibal, other than that involved herein, to points in Illinois and Missouri. Although the application was not supported by consignees of cement, the ICC in its discretion determined that cement receivers could and would use the service authorized. The ICC also found a need for the complete and highly coordination transportation service which could not be rendered by any of the protestants. Only Slater of the motor carrier protestants held authority for both bulk and packaged cement. The remaining motor carriers, including plaintiff Tucker, hold authority to transport only packaged cement. In short, the ICC found that public convenience and necessity required the proposed operation and issued an order granting the Certificate.

On February 19, 1962, Tucker filed a petition for reconsideration and on February 23, 1962, the Public Service Commission of Missouri filed a petition for leave to intervene and asked the ICC to reconsider its order. Hamm and Universal Atlas filed separate replies to each petition. By an order dated May 24, 1962, the ICC permitted the plaintiff Public Service Commission, State of Missouri, to intervene and denied the petitions of both plaintiffs for reconsideration. On September 10, 1962, the ICC, Division No. 1, issued a certificate to Hamm covering the operation.

The matter has been fully briefed by all parties and a hearing was held before a three-judge court on January 25, 1963.[1]

The evidence contained in the transcript develops the following facts: The Universal Atlas plant at St. Louis, Missouri, was not in operation but under construction at the time of the hearings. Upon completion it was anticipated that the plant would be solely a storage facility with a capacity of approximately 50,000 barrels and with loading facilities for both rail and truck. The design of the plant requires coordination of loading bulk and bag cement and coordination of loading for truck and rail. It was anticipated that within three years after the plant began operation Universal Atlas would distribute annually from said plant approximately 500,000 barrels of cement, of which approximately half would be shipped to Illinois and half would be shipped to Missouri. Eighty percent of the shipments would be in bulk and twenty percent in bags and packages. The storage facilities at St. Louis would be supplied principally from the Universal plant at Hannibal, Missouri, which movements would come to St. Louis primarily by barge on the Mississippi River. There would be some shipments to the St. Louis plant by rail from Hannibal and from other Universal plants located in Indiana, Pennsylvania and Kansas. Interstate movements within Missouri will involve out of state cement handled directly through the St. Louis plant but without storage. Statewide authority in Missouri was sought to meet emergency situations.

We are of the opinion that only one question is presented in the case. While the plaintiff Public Service Commission, State of Missouri, would have us consider whether the grant of authority to Hamm was for intrastate carriage and, therefore, unlawful, that question is disposed of by observing that the ICC order is limited to traffic in interstate or foreign commerce and by the disposition of the major issue before the Court: whether the ICC's finding that the present and future public convenience and necessity require the operation by Hamm, in interstate or foreign commerce, as a common carrier by motor vehicle from the plant site of Universal Atlas in St. Louis, Missouri, to all points in Missouri is supported by substantial evidence. The ICC granted authority to Hamm to operate from the plant site to Missouri and Illinois. No objection was raised here to the Illinois portion of the order. Plaintiffs' attack on the Missouri portion is two-pronged: First, plaintiffs assert that there is not substantial evidence of sufficient volume of traffic in interstate commerce from the plant site to points in Missouri to warrant a finding that public necessity and convenience require the authority granted even as applied to the limited counties in Missouri where the supporting shipper would actively solicit sales. Second, plaintiffs assail with particularity that portion of the order granting Hamm statewide authority.

The evidence showed that the major primary initial movement into the St. Louis plant would be by barge from Hannibal, Missouri. While such traffic could be shipments in interstate commerce because Illinois would be traversed in the channel of the Mississippi River, still if private barges of the supporting shipper were used, the initial movement would not be the first leg of an interstate

1. Prior to a hearing before the Court, plaintiffs filed a motion to strike portions of defendant Daniel Hamm Drayage Company's brief relating to the order of the Missouri Public Service Commission granting intrastate authority to Hamm on two separate occasions. Thereafter, Hamm filed a brief and attached thereto the order of the Public Service Commission, State of Missouri, in Case No. T-8139 (Sub 1), dated August 17, 1961, wherein Hamm was granted authority to operate in intrastate commerce in 28 Missouri counties, and a copy of an order of January 18, 1962, where Hamm was granted authority to operate intrastate in six more counties. The motion will be overruled in view of the fact that the grants of intrastate authority are not pertinent to the decision of the Court.

shipment. Pennsylvania Railroad Co. v. Public Utilities Commission of Ohio, (1936) 298 U.S. 170, 175, 56 S.Ct. 687, 80 L.Ed. 1130.

 The evidence does not precisely reveal the character of the barge movement. On page 62 of the transcript the general traffic manager of Universal Atlas simply indicates that shipment will be via barge. On page 103 of the transcript the same witness notes that "when the bins are full we can keep the barge at St. Louis, so you have a potential of 60,000 barrel storage at St. Louis". This is some indication that the barge is privately owned by and operated exclusively for Universal Atlas as was stated during oral argument. The question of the character of the barge operation cannot be determined from the evidence before the ICC. However, even assuming, without so deciding, that the barge movements from Hannibal to St. Louis were in interstate commerce, the interstate character of the shipment would end in the St. Louis storage facility unless there had been a determination prior to the shipment to St. Louis that the cement was destined for other points in Missouri *and* the cement did not come to rest in the St. Louis facility. Atlantic Coast Line R. R. Co. v. Standard Oil Co. of Kentucky, (1927) 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270. Cf. East Ohio Gas Co. v. Tax Commission of Ohio, (1931) 283 U.S. 465, 51 S.Ct. 499, 75 L.Ed. 1171 as to the state's taxing power; Walling v. Jacksonville Paper Co., (1942) 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460, which involves the Fair Labor Standards Act, and United States v. Yellow Cab Co., (1947) 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010, involving the Sherman Anti-Trust Act. Note also Beggs v. Kroger Co., (8th C.A., 1948) 167 F.2d 700, where the Fair Labor Standards Act was also under consideration, but the Court noted at page 703 that on the instant facts "[D]efendant knew when the shipments began outstate that all of them were destined to the retail stores. The warehouse was not a wholesale establishment and none of the goods that entered it were resold."

 In our view there is not substantial evidence of the interstate character of shipments into Missouri points based solely on the barge movement from Hannibal to St. Louis, Missouri, to warrant the ICC finding of public convenience and necessity for interstate shipments to Missouri points. The grant of statewide authority did not in whole depend upon the questionable interstate character of the major method of stocking the St. Louis facility by barge from Hannibal, Missouri. There was evidence that the St. Louis facility would receive cement by rail from outstate plants of the supporting shipper. In the event that there would be a predetermined destination in Missouri for cement so shipped and in the event that such shipment did not come to rest in the St. Louis facility, such shipment would be in interstate commerce. But the evidence showing the need for the statewide authority so far as the outbound movement from the St. Louis facility was concerned was the possibility of emergency situations. Such emergencies were characterized as labor strikes in other plants and the unavailability of a particular type of cement at the Kansas plant which apparently serves the western part of Missouri. Such an emergency is a scant possibility of creating interstate traffic in Missouri when it is considered that either emergency would have to coincide with a continuation of an interstate movement predestined for the emergency area prior to its shipment into St. Louis and without coming to rest there before such shipment would be in interstate traffic. There is no showing that this is more than a mere remote possibility. While it is true that the ICC may base a finding on future public convenience and necessity, still the finding for the future must have some evidentiary basis of the anticipated need. United States v. Detroit Navigation Co., (1945) 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38, cited by defendants, is not to the contrary in view

of the evidentiary basis noted at page 240, 66 S.Ct. at page 77.

It is also observed that the ICC recently held in a case cited by plaintiffs that occasional emergency demands for service do not warrant authorization of an additional carrier to enter the field. Wenham Transportation, Inc., Ext-Rolling Mill Rolls, (1961) 14 Fed.Carr.Cases, paragraph 35, 193.

The foregoing applies to the statewide grant of authority and for the reasons stated we are of the opinion that the Missouri grant to Hamm is without substantial evidence to support it. However, it was developed by the attorney for plaintiff Tucker in the hearing before the Joint Baord that the most direct route to southeast Missouri from St. Louis by truck was to cross the river at St. Louis, Missouri, into Illinois, and proceed southward to cross the bridge into Missouri at Perryville. Consequently, if this route were followed, shipments from the St. Louis, Missouri, plant to points in Missouri south of Perryville, Missouri, would constitute shipments in interstate commerce.[2]

It appears to the Court that both the applicant and the supporting shipper took positions before the ICC which negate the possibility of interstate traffic in Missouri. For example, the applicant Hamm stated at page 12 of its exceptions to the report and order of Joint Board No. 135:

"This carrier hardly deserves consideration as a protestant in this case for doubtless 99%, if not all, of the movements from Universal Atlas' St. Louis facility to points in the State of Missouri will be Missouri intrastate movements."

Again at page 28 of the same exceptions, Hamm said:

"It must be remembered that the only purpose for applicant's inclu-

sion of points in Missouri in this application was based on the outside chance that a barge load of cement arriving in St. Louis may not be stored in Universal Atlas' St. Louis long enough to be considered a break in the interstate shipment, so that a continued movement by Applicant Hamm, by some stretch of the imagination, might be considered an interstate movement. This possibility is extremely doubtful, and Applicant Hamm already has Missouri intrastate authority to transport both bulk and bagged cement."

The supporting shipper, Universal Atlas, in its exceptions to the report of Joint Board No. 135 at page 18 stated:

"The authority of the protesting carriers to transport cement interstate within the state of Missouri has not been dwelt upon extensively. This interstate movement is relatively unimportant. Interstate authority was requested only as a protection against the possibility of cement moving in and out of the St. Louis distributing plant from out-of-state destinations without having come to rest there (73, 74). Since all bulk cement is brought in from Hannibal, Missouri, this situation can only occur with respect to specialty cements—lumnite and white cement—which are received and shipped out in packages in mixed truckloads or carloads. The situations where an eventuality would occur which would bring the interstate authority into play are, therefore, rare indeed."

But more important than the negative view of possible interstate traffic in Missouri taken by Hamm and Universal Atlas, the record before the ICC is devoid of evidence to support a finding of

---

2. In pertinent part 49 U.S.C.A. § 303(a) (10) provides: "The term 'interstate commerce' means commerce between any place in a State and any place in another State or between places in the same State through another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water * * *."

the interstate character of traffic in Missouri.

In view of the validity of the ICC's order as it respects Illinois, it appears that a need may exist for service to certain areas of Missouri which would be served along with the southern portion of Illinois. However, the authority granted is unlimited in Missouri. It is not for this Court to determine the counties or areas of Missouri for which a need may be shown for interstate carriage of cement. In an order accompanying this memorandum, the portion of the ICC order granting Hamm statewide authority in Missouri will be set aside.