**LOUISIANA & ARKANSAS RAILWAY COMPANY, Plaintiff,**

v.

**EXPORT DRUM CO., Inc., Defendant.**

**Civ. A. No. 7735.**

United States District Court
E. D. Louisiana,
New Orleans Division.

April 2, 1964.

James R. Brown, Elizabeth R. Haak, Robert N. Ryan, Guy C. Lyman, Jr., New Orleans, La., for plaintiff.

Theodore Pfister, Jr., of Kierr & Gainsburgh, New Orleans, La., for defendant.

FRANK B. ELLIS, District Judge.

First, this action arises under the laws of the United States, and particularly, the Act of June 25, 1948, 28 U.S.C.A. § 1337. Plaintiff is a common carrier in interstate commerce. Between April and October, 1956, plaintiff delivered various carloads of old steel drums to the defendant at Baton Rouge, Louisiana, from various cities in Texas and Tennessee. There were twenty-two shipments in all, and the plaintiff claims it undercharged the shipper in the total amount of $2,483.29.

The shipments generally may be classified as (1) The Texas Shipment, and (2) The Tennessee Shipment.

It is a fact that the shipments moving from Texas are governed by Item 13790 of Supplement 3 to the Uniform Rate Classification No. 3, unless it is shown that the defendant is entitled to a preferential rate by virtue of compliance with the requisites of Note 18, Item 9552, of Supplement 3 to Uniform Freight Classification No. 3, as incorporated into item 9265 of Supplement 3 to the Uniform Rate Classification No. 3, resulting, plaintiff alleges, in an undercharge of $564.95.

The Tennessee shipments cover those originating in Knoxville and Nashville, and the problem presented is whether these shipments were entitled to an export rate or whether they were governed by the carload ratings described by Item 13790, Supplement 3, of the Uniform Freight Classification Schedule No. 3.

The amount of the undercharge here involved $1,918.34.

This case was tried without benefit of a jury and almost every matter of fact was subject of stipulation, as follows:

1.

The facts set out in Paragraphs 1, 2 and 3 of plaintiffs' complaint are true.

2.

Uniform Freight Classification No. 3, Freight Tariff No. S–1011 (Southern Freight Tariff Bureau), Southwestern Lines' Freight Tariff No. SW 1004, Supplement 3 to Uniform Freight Classification No. 3, Supplement 47 to Freight Tariff No. S–1011 (Southern Freight Tariff Bureau), Supplement 56 to Southwestern Lines Tariff SW–1004, Supplement 13 to Tariff 1016–K (Southern Ports Foreign Freight Committee), Tariff 1016–K (Southern Ports Foreign Freight Committee), and Tariff of Increased Rates and Charges Nos. X–175–C and X–196–A, were duly published and filed with the Interstate Commerce Commission and were in effect at all times pertinent to this litigation, and photostatic copies of same, in whole or in part, may be admitted into evidence without further proof of their authenticity, as fully as if they were certified by the Secretary of the Interstate Commerce Commission.

3.

In its capacity as common carrier in interstate commerce, plaintiff received various carloads of old, used steel drums for shipment and delivery to defendant at Baton Rouge, Louisiana, which carloads of steel drums are correctly described on the attached freight bills and were delivered to defendant on the dates shown on said freight bills.

4.

Each of the attached freight bills shows the correct information as regards consignee, route, point of origin, point from which waybilled,

waybill date and number, name of shipper, car identification, point of shipment (where indicated), number of packages, articles and marks, weight, delivery date, rate claimed by the railroad and total freight actually paid.

5.

Defendant had in its possession bills of lading corresponding to each shipment covered by the attached freight bills, which bills of lading were destroyed in a fire which occurred during March of 1962. Each of the bills of lading now destroyed, covering the shipments from Texas to Baton Rouge, Louisiana, bore the following inscription:

"This certifies that these steel drums were received filled in railroad freight service."

This inscription was placed on each bill of lading by agents or employees of defendant.

6.

These bills of lading were the sole records maintained by defendant in connection with the requirements of Note 18, Item No. 9552 of Supplement 3 to Uniform Freight Classification No. 3, for verification and inspection by authorized representatives of plaintiff.

7.

The drums which were shipped by rail from Texas to Baton Rouge, Louisiana, were received filled in prior railroad freight service at the Buick-Oldsmobile-Pontiac plant of General Motors Corporation located at Arlington, Texas.

8.

The drums which were shipped from Texas to Baton Rouge, Louisiana, were moved by trucks (owned and operated by defendant), from the Buick-Oldsmobile-Pontiac plant at Arlington, Texas, to Miller Yard, Dallas, Texas, a distance of between 12 and 25 miles, which place was the point of origin of the rail shipments involved in this litigation.

9.

The drums which were shipped by rail from Knoxville and Nashville, Tennessee, to Baton Rouge, Louisiana, were moved from Baton Rouge to the location of the International Lubricant Company plant, 309 Jefferson Highway, New Orleans, Louisana, in trucks owned and operated by defendant.

10.

The drums which were shipped by rail from Nashville and Knoxville, Tennessee, to Baton Rouge, Louisiana, were exported from the Port of New Orleans, Louisiana, by International Lubricant Company.

11.

It is stipulated that, with regard to the aforementioned shipments originating in Knoxville and Nashville, Tennessee, the only issue to be resolved on the trial or other hearing in this case is whether said shipments were entitled to an export rate, or whether they were governed by the carload ratings prescribed by Item 13790 of Supplement 3 to Uniform Rate Classification No. 3.

12.

It is stipulated that, with regard to the aforementioned shipments originating in Texas, the only issue to be resolved on the trial or other hearing in this case is whether the said shipments were governed by the carload ratings prescribed by Item 9265 of Supplement 3 to Uniform Rate Classification No. 3, or whether they were governed by the carload ratings prescribed by Item 13790 of Supplement 3 to Uniform Rate Classification No. 3.

The issue presented by the foregoing facts is whether the short drayage by shipper's own truck, which was not a public carrier and in no way a competitor of the railroad, breaks the sequence

of railroad movements so as to deprive the shipper of the favorable railroad tariff.

■ The next factual question involves the certification of prior rail movement.

The applicable tariff provision does state that the carrier is to be furnished with a certificate containing pertinent verbiage as follows: " * * * the filled containers were received by railroad freight service * * * "

In this case the shipper (which was both consignor and consignee) furnished a certificate in somewhat different verbiage, namely: " * * * these steel drums were received filled in railroad freight service."

No factual issue is presented as to whether the specific empty drums shipped from Texas to Louisiana were in fact received as filled drums into Texas by prior railroad freight service; these facts are admitted by the carrier (Stipulation No. 7).

The certification furnished the carrier was compiled by the shipper's representative, who handled the transaction personally on the ground in Texas where he had the opportunity to investigate and determine the facts to which he certified. This shipper, which was shipping to itself, maintained records in the form of copies of the bills of lading, which records were destroyed in the total-loss fire of Roy Hurd's office at 215 Boston Street, Covington, Louisiana, during March 1962 (admitted by all parties, Stipulation No. 5).

An issue presented is whether the verbiage of the certificate furnished, supra, suffices to meet the form of certificate referred to in the tariff, supra.

The carrier's position is that the shipper's sought-for favorable "ratings" apply only when the immediate preceding transportation of the filled containers to the *shipping point* of the empty containers was by railroad freight service (Item 8552, Note 18, Classification #3), and that "shipping point" means the precise point where the shipped goods were to be loaded on the train.

The carrier's position is that in order for the shipper here to benefit by the favorable rate these drums, which were shipped from Miller Station, must have been received by rail at Miller Station, instead of Arlington, fifteen miles away.

The position taken by the defendant is entirely compatible with the tariff rates, which make no distinction whatsoever between Arlington and Miller Station.

Also, the tariff contemplates that there will be some movement of the drums, because it mentions empty drums and filled drums. The beneficial rate applies to drums which were full when received and empty when shipped. It is not expected that the drums will be emptied in the railroad freight yard; they must be moved somewhere to be emptied and then returned. The only reasonable construction to be given to the tariff in this regard is that movement within the shipping point will not only be permitted but is anticipated.

The carrier here would appear to contend that in order to enjoy the lower rate the shipper in this case should have taken the drums after accumulating them in Miller yard, and have transported them by its truck back to the siding at Arlington, whereupon the carrier would take its empty freight cars and transport them from Miller yard to the Arlington siding, where the actual loading would take place. This is untenable.

The record shows that Arlington and Miller Station are in the same commercial area. Mr. Stanard, the expert, testified that by "shipping point" the tariff contemplates the same general commercial area.

Geographical distances which are not inconsequential may be included in such point or area. Thusly the distance between Michoud and Southport or even Harahan or Avondale (which are shown as different "stations" on the tariff, albeit they have the same rate) are in the New Orleans area and together constitute, as this court construes it, a ship-

ping point, and the defendant who is both consignor and consignee is entitled to the lesser rate.

Part (b) of Note 18 requires that the shipper maintain records of the filled containers received or forwarded and the empty containers returned, and that the stipulations and evidence in this case show a total failure to comply with this requirement. Paragraph 6 of the Stipulation filed herein clearly evidences that the only records maintained by defendant were copies of its bill of lading, which show on their face that they do not constitute records of filled drums received and empty drums returned, and the plaintiff further asserts that Part (c) of Note 18 sets forth explicit requirements with regard to certification, and expressly sets forth the form of certificate which must be furnished by consignor or consignee. No such certificates were furnished in connection with these shipments which, as Paragraph 5 of the Stipulation shows, moved under bills of lading which stated only:

> "This certifies that these steel drums were received filled in railroad freight service."

It is true that statements on the bills of lading are not in the form explicitly prescribed by the tariff which reads:

> " * * * the filled containers were received by railroad freight service * * * "

This court believes that the required certificate and the one issued are so similar that the condition of certification has been met.

■ Manifestly, the primary intent and purpose of the Interstate Commerce Act is to insure uniform treatment of those who use this country's transportation facilities. United States v. Howitt, 328 U.S. 189, 66 S.Ct. 923, 90 L.Ed. 1162. If trivialities are employed to differentiate one shipping point, where the two are immediately contiguous, uniform treatment is destroyed and the intent of the statute is frustrated.

This court does not feel that cases cited by the plaintiff are determinative of the issue here presented and therefore this court finds for the defendant as to the Texas Shipment.

\* \* \*

■ As to the Tennessee shipment, the Court finds that plaintiff has correctly expressed the problem here presented in the able trial memorandum submitted to the Court, which is quoted:

"Consideration of the Tennessee shipments necessarily begins with Item 4790 of Southern Ports Foreign Freight Committee Freight Tariff 1016–K (Exhibit 8) since the defendant claimed the preferential export rate covering these shipments. Item 4790 provides that export rates ' * * * are applicable only via routes named in SPFFC Routing Guide 1031 * * * ' Mr. McKinney, plaintiff's expert, testified on the trial that neither SPFFC 1031 (Exhibit 12) nor SPFFC 1031–A (Exhibit 13), the applicable tariffs, publish any direct routes between Nashville and Baton Rouge or between Knoxville and Baton Rouge. He further explained the intermediate rule contained in the tariff, providing that points intermediate between an origin and a more distant point take the rate of the more distant point if it is lower than the rate to the intermediate point if the intermediate point is on a route permitted by the tariff to the more distant point, and stated that the Tennessee shipments were not entitled to preferential treatment thereunder. There being no published routings, neither Knoxville nor Nashville could qualify for the lower rate. The testimony of Mr. Stanard in no way contradicts Mr. McKinney since he frankly admitted that he knew of no published routes which would entitle the Tennessee shipments to an export rate. As Item 4790 of Tariff 1016–K plainly shows, export rates apply only via published routes. No such routes were followed or were available to these shipments and thus the export rate could not possibly apply.

"There is, however, an additional element with regard to these Tennessee shipments, and that is the fact that they

were trucked from Baton Rouge to New Orleans and thence exported. Mr. McKinney testified that in order for the export rate to apply, the transported goods must be exported from the destination point of the inbound shipments which, in this case, was Baton Rouge. His opinion is consonant with Item 100 of Tariff 1016–K (Exhibit 15), which in pertinent part provides:

" 'Rates published herein apply only on export traffic transported from the port to which the rate is published via direct or trans-shipping ocean steamship service to foreign countries and then only under the following conditions:

" '(a) On traffic which does not leave the possession of the inland rail carriers until delivered to the ocean carriers or their agents, or

" '(b) On traffic which leaves possession of the inland rail carriers at an intermediate point or after arrival at the Port of Exit when application of Export rates under such circumstances is authorized in a tariff on file with the Interstate Commerce Commission, or,

" '(c) On traffic delivered to party entitled to receive it at Port of Exit provided it is handled direct from carriers facilities to steamship docks and there delivered to ocean carrier or its agent and on which proof of exportation is given within 60 days of date rail carrier delivers shipment to the party entitled to receive it, or

" '(d) On traffic consigned to the United States Government and handled through Navy Bases, Navy Yards or Army Bases, the rates herein apply only provided proof of exportation is given to the inbound line-haul carrier within 60 days of date rail carrier delivers shipment to the United States Government, or

" '(e) Rates published in this tariff, as amended, will not apply on freight stopped in transit for partial unloading, except that export rates pub-

lished herein will apply on the export portion of mixed carload shipments of export and domestic freight moving under provisions of Item 180 series of SPFFC Exceptions Tariff 1030–C, H.M. Engdahl's I. C.C. 61, stopped in transit for unloading of all or a portion of the domestic freight in the car.'

"Here, the destination point of the rail shipments was Baton Rouge and it was to that city that the rate was published. Here, the ' * * * direct or trans-shipping ocean steamship service * * *' referred to in the tariff originated from the Port of New Orleans, not from the destination point of the rail shipments. Under the facts of this case, none of the conditions of Subparagraphs (a) (c) (d) (e) or Item 100 of Tariff 1016 K were met, and the evidence adduced on the trial shows that the condition prescribed by Subparagraph (b) was not met either. As a matter of fact, Southern Ports Foreign Freight Committee Freight Tariff 1033–R (Exhibit 16), which is related to and must be read in conjunction with subparagraph (b) of Item 100 of Tariff 1016K, complements the provisions of Tariff 1016K by providing, in pertinent part, as follows:

" '(a) Rate on shipment *into the transit port of exit* will be the current domestic all-rail rate, from point of origin, to such transit port of exit. (See paragraph (e)).

" '(b) Upon exportation of the entire inbound carload, the inbound rate will be readjusted, as provided in Item 165, to basis of the export all-rail carload rate, *from point of origin to transit port of exit*, in effect on date of shipment from such point of origin. Where such export rate to the transit port of exit is dependent upon the foreign country of destination, the respective carload export all-rail rate will be applied on the actual weight (of the inbound shipment) exported to each foreign country, the entire carload, however, to be subject to the applicable minimum weight with

such export rates. (See paragraph (e)).' " (Emphasis supplied).

Thus, both Tariff 1016 K and the foregoing provisions of Tariff 1033–R clearly contemplate that the destination point of the rail shipment must be the same as the "transit port of exit". The case at bar involves shipments of used steel drums which were not exported .by the consignee from their destination point. They were trucked from Baton Rouge to New Orleans and exported from that port by International Lubricant Company, defendant's vendee. As Mr. McKinney testified, and as the aforementioned tariffs show, no export rate can apply under such circumstances.

 The rule that all of the requisites of the tariff must be met in order to entitle the shipper to an export rate has been announced in the following cases: Atlantic Lbr. Corp. v. Southern Pac. Co., 47 F.Supp. 11, and Mack Manufacturing Corp. v. Alton & Sou. Ry., 263 I.C. C. 331. Failure to comply with all of the conditions precedent results in the application of the higher domestic rate.

It is admitted by all of the parties that this shipment passed through New Orleans, the ultimate place of export, and that the drums were not taken off at New Orleans but went through to their destination at the consignee's plant in Baton Rouge. In Baton Rouge the drums or similar drums were reconditioned and only then were they delivered to Export's customers for filling and export by ocean freighter. This was accomplished by hauling in defendant's trucks from Baton Rouge to New Orleans to the International Lubricant Corporation, defendants vendee.

Despite the fact that the rating and route were subject to change by the Interstate Commerce Commission, it does not influence a decision in this case since a change had not been promulgated when the shipment in question arose. Any change or alteration in the tariff charged or in the routes to be followed would of necessity, if prejudicial, fall within the jurisdiction of the Interstate Commerce Commission, and would not be for this court to determine. It has long been established by our jurisprudence that if freight rates paid for a shipment are less than the tariff approved by the Interstate Commerce Commission, the railroad is required to collect the undercharge under penalty of severe fines. Interstate Commerce Act, 49 U.S.C.A. § 10; Spencer Kellogg & Sons v. United States, 2 Cir., 20 F.2d 459. Great Northern R. Co. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943, at p. 946.

It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Louisiana & Arkansas Railway Company, against defendant, Export Drum Co., Inc., in the sum of $1,-918.34, with 5% interest from date of this judgment, and that there be judgment in favor of defendant rejecting plaintiff's claim in the amount of $564.95, each party to bear his proportionate share of the costs.