The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Plaintiff,

v.

ERMAN–HOWELL DIVISION OF LURIA STEEL & TRADING CORPORATION, a corporation, Defendant.

No. 65 C 1680.

United States District Court
N. D. Illinois, E. D.

Feb. 9, 1968.

---

Floyd Stuppi and Gus Svolos, Chicago, Ill., for plaintiff.

Aaron, Aaron, Schimberg & Hess, and Winston, Strawn, Smith & Patterson, Chicago, Ill., for defendant.

## DECISION AND ORDER ON THE MERITS

ROBSON, District Judge.

This case involves the interpretation of one of the plaintiff's tariffs. This court concludes that the proper interpretation demands that judgment be rendered for the defendant.

The defendant, a scrap broker, purchased scrap iron from seven railroads. These railroads, at defendant's direction

(even though title did not pass until later), transported this scrap to the Kansas City, Mo.–Kan. Switching District. Because this scrap remained company material of the railroads, the railroads did not have to charge any rates for this movement from the various points of origin outside the Kansas City Switching District.

When this scrap arrived at the vendor railroads' terminals or interchange point in the Kansas City Switching District, the plaintiff took possession of the cars and switched them over to the consignee, the Erman Corporation, which processed the iron in its plant in Turner, Kansas, which is within the Kansas City District. This was necessary because the Santa Fe leases the land to the Erman Corporation and provides the only rail service to its Turner plant. This switching service, however, must be paid for.

Each of the vendor railroads determines which of the Santa Fe switching rates apply and bills either the defendant or the consignee, the Erman Corporation, for the service. Under Santa Fe Tariff No. 7555–R, these railroads have a choice of two rates: the Section 1 rate, the reciprocal switching rate, or the Section 2 rate, the intra-terminal rate.* The plaintiff contends that Section 2 should apply, and is here suing for the alleged undercharges of $19,602.53. The defendant disagrees and claims that the Section 1 rate is the proper one.

The main issue is the interpretation of essentially one word in Section 1 of the tariff. In Item 200, the following language appears:

"Charges in this Section 1 are applicable only in connection with road-haul *shipments*. * * * " (Emphasis added.)

The *underlined* word, "shipments," is the cause of this litigation. The plaintiff alleges that the plain, ordinary, everyday, dictionary meaning of this word demands a delivery of the goods to a common carrier for hire. Under plaintiff's definition, the movements involved in this case are not entitled to this lower, Section 1 rate. The defendant also alleges that the plain, ordinary, everyday, dictionary meaning supports its position that Section 1 does apply. The movements of company-owned material are shipments, argues the defendant, although admittedly without a charge and without a "delivery" by a person other than employees of the vendor railroads.

The parties had to argue that the word in question was used in its ordinary sense. If it had some special meaning, peculiar to the trade, it is fairly clear that they would have had to submit the question to the Interstate Commerce Commission for a ruling, before this court would have had jurisdiction of the question. Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922); Montgomery Ward and Co. v. Roy Stone Transfer Corporation, 329 F.2d 172 (4th Cir. 1964). As the latter case points out, at 174:

"* * * [W]here the issue of tariff construction involves 'factors "the adequate appreciation of which" presupposes an "acquaintance with many intricate facts of transportation," ' primary jurisdiction lies in the I.C.C. United States v. Western Pacific R. Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 * * * (1956)."

As will become evident later, the word "shipment" does not demand an "acquaintance with intricate facts of transportation." The term was used in its ordinary, everyday meaning, and there is, therefore, no need to resort to the I.C.C. Indeed, there are several Commission decisions cited below which indicate that the Commission has considered this word and used it continually in the same way in which this court construes it.

Since both sides contend that theirs is the correct dictionary definition, it is instructive to see what the dictionaries

---

\* Section 2 also deals with the *inter*-terminal rate. The parties have stipulated, however, that if the Section 2 rate is the proper rate, the lower, intra-terminal rate would apply.

themselves say. Webster's Third New International Dictionary (1963) defines a "shipment" in basically two ways:

"1. : the act or process of shipping : [the symbol ':' divides the various senses of a word] the delivery of goods to a carrier for transportation 2. : a commodity, consignment, or cargo shipped"

In typical dictionary fashion, we are led to look at the meanings of other words, in this case, "shipper" and "to ship." A "shipper" is defined as,

"2. : one that ships : a : one that sends goods by any form of conveyance : CONSIGNOR, SHIPPING CLERK b. : the receiver of goods or cargo : CONSIGNEE"

Turning to the verb "to ship," we find this:

"\* \* \* 1b (1): to cause to be transported 1a: to place or receive on board of a ship for transportation by water: cause to embark"

Webster's Second International (1947) makes only one or two additions to the above definitions. To the definition of "shipper" it adds:

"2. One who ships goods; broadly, one who sends goods by any form of conveyance."

To the word "ship," it adds:

"2b U. S. To transport, or commit for transportation."

The Oxford English Dictionary (1933) agrees with the Third International and adds the same (or similar) definitions that the Second International adds.

It is apparent that the general dictionaries do not support the plaintiff's contention that a shipment requires payment to the carrier for the transportation. The need for delivery by a person other than the carrier is only supported by one of two senses in which the word is used as the word is defined in the Third International. This support is not that firm, as is apparent from the first sense of the definition in the Third International.

The law dictionaries agree with these general dictionaries in the broad definition of the word "shipment" as meaning the mere sending or transporting of goods by any form of conveyance. In addition, they add more specialized meanings, including the use of a "common carrier for hire," "delivery" to the carrier, and cite several cases which the plaintiff cites in its briefs. Bouvier, Law Dictionary (1914); Black, Law Dictionary (1951); Ballantine, Law Dictionary (1948). See also The Century Dictionary (1911), and 80 C.J.S. at 560, 562.

There are very few cases in the federal courts or the Interstate Commerce Commission which deal with the definition of the word "shipment." This is not too remarkable, especially since both sides are contending that there is no special meaning attributable to the word, even as used in the tariff in question. Some of these cases, however, are of interest to this inquiry.

One line of cases that seems particularly appropriate was not cited by either party. In the Matter of Transportation of Company Material, 22 ICC 439 (1912); New Mexico Central Ry. Co. v. Atchison, Topeka & Santa Fe Ry. Co., 81 ICC 718 (1923). The former case ruled that a carrier was a "shipper" when it transported its own company material over the lines of a connecting carrier. This conclusion, without more, would not answer our question of whether company material when transported over the lines of the owner-railroad still retained its character as a "shipment." However, the Commission did use the word "shipment" to refer to the continuous movement of the company material, without making the distinction which the plaintiff urges.

The Commission clarified its position in the *New Mexico* case, supra. The facts of this case leave no doubt as to the meaning the Commission gave to the word "shipper." The Santa Fe carried fuel coal over its own lines to service its equipment. The New Mexico Central had a line which provided a more direct route

for this fuel, and went to the ICC to try to force the Santa Fe to use the shorter route. Although the ICC refused to force the Santa Fe to do this, one of the contentions that New Mexico Central made was that the Santa Fe was not a "shipper" as the term was used in Section 15, Paragraph 10 of the Interstate Commerce Act. "On the contrary," concluded the Commission, "we have repeatedly referred to carriers as shippers when engaged in transporting material belonging to them." When this language is considered in the light of the facts of the case, i. e., that the only movements in dispute involved the transportation of company material over Santa Fe's own lines, the word "shipment" is taken to refer to the disputed movements involved in this case.

█ If this were not enough, the Commission made a further distinction between the term "shipment" and "commercial shipment." New Mexico Central Ry. Co. v. Atchison, Topeka & Santa Fe Ry. Co., supra. This latter distinction, in addition to use of the term "shipment" to refer to movements of company material, is found in several other cases. E. g., In the Matter of Rates, Divisions, Rules, Regulations, and Practices Governing the Transportation of Railroad Fuel and Other Coal, 36 ICC 1, 4, 9 (1915); In the Matter of Filing with the ICC Divisions of Joint Rates Applicable to Railway Fuel Coal, 37 ICC 265 (1915); American Brake Shoe & Foundry Co. v. Alabama Great Southern R. R. Co., 26 ICC 446 (1913), MacGillis & Gibbs Co. v. Chicago, R. I. & P. Ry. Co., 192 ICC 658 (1933); Scherrer & Bennett Co. v. Atchison, Topeka & Santa Fe Ry. Co., 246 ICC 647 (1941). The Commission has also made it clear that the word "shipper" as used in the Transportation Acts should be given a "liberal construction." Swift & Co. v. B & O R. R. Co., 266 ICC 55, 70 (1946). Because the word "shipment" is to be understood in its everyday connotation, these Commission cases are not conclusive evidence of the meaning which this court should adopt. They do, however, provide some evidence which this

court can consider in arriving at the proper construction of the term. There are at least two Commission cases which the plaintiff cites that, if only partially or ambiguously, support plaintiff's narrower meaning. Service Transportation Co., 44 MCC 419 (1945); M. D. Friedman Co. v. Chesapeake & Ohio Ry. Co., 194 ICC 455 (1933); (four members dissenting). However, in *Service Transportation Co.*, supra, company-owned materials, transported without charge or "delivery," were referred to as "shipments" several times. In *Friedman*, supra, the question was whether there was interstate commerce when a private carrier does the moving over state lines, and there is subsequent common carrier movement. In determining that there was no interstate commerce, the only thing they had to decide was that there was no shipper-carrier *common carriage* relation, and did not decide the question involved in the case before this court.

The plaintiff also cites several federal and state cases which allegedly support its position. All of these cases are distinguishable from the case at bar.

Three of the federal cases involved the same (or similar) issue as was decided in *Friedman,* supra, and the discussion above applies with equal force here. Pennsylvania Railroad Co. v. Public Utilities Commission of Ohio, 298 U.S. 170, 56 S.Ct. 687, 80 L.Ed. 1130 (1936); L. A. Tucker Truck Lines, Inc. v. United States, 215 F.Supp. 261 (E.D.Mo.1963); Pennsylvania Railroad Co. v. United States, 242 F.Supp. 890 (E.D.Pa.1965).

The case of Louisville Water Co. v. Illinois Central R. R. Co., 14 F.Supp. 301 (W.D.Ky.1936), was concerned with the difference between the meanings of the words, "switching" and "transportation." In the instant case, it was stipulated that both the disputed rates were "switching" rates. (Stipulation, p. 4.) In addition, the qualifying word "usually" was inserted into the *Louisville* court's definition of "shipment" which supports the plaintiff's position, and the question of company material was not raised. Id., at 303.

Macondray & Co. v. W. R. Grace & Co., 30 F.2d 647, 649 (9th Cir. 1929), construed a C.I.F. contract as requiring delivery to the carrier. Again, there was no question raised concerning the transportation of company-owned material.

In Arnold v. United States, 115 F.2d 523 (8th Cir. 1940), the court was strictly construing a criminal statute which prohibited the interstate shipment of intoxicating liquors. That court concluded that because the statute was designed to regulate common carriers and those delivering to them, the word "shipment" should be defined in a limited way. The court recognized, however, that the "primary idea of the verb 'ship' is to place on board a ship or vessel for transportation." Id., at 526.

Consolidated Engineering Co. v. United States, 201 F.Supp. 828 (D.Md. 1962), was a suit for a tax refund. There the court determined that since the tax was designed to apply only to those companies engaged in transportation for hire, the tax should not apply to a seller of goods who delivered them in its own trucks at no charge to the buyer. The purchase was not of transportation, but of goods, said the court.

The only issue possibly relevant to our inquiry in Louisiana & Arkansas Ry. Co. v. Export Drum Co., Inc., 228 F.Supp. 89 (E.D.La.1964), involved the movement of a shipper's own goods in his trucks. The precise issue, however, was whether this trucking movement (which was between two rail movements) broke up the travel of the goods sufficiently so that the shipper would be deprived of the more favorable export tariffs relating to "rail shipments" from the farthest point of movement. The court decided that the shipper was not within the definition of that term as used in the tariff since the rail carriage was not substantially continuous. The court did, however, describe the truckloads as being "shipped" from Baton Rouge to New Orleans, even though the loads were owned by the trucker.

In National Importing and Trading Co., Inc. v. E. A. Bear & Co., 324 Ill. 346, 155 N.E. 343 (1927), the court was construing a contract for shipment and only held that mere loading of the goods onto the ship did not constitute a "shipment." In the instant case, this is not even an issue. There is no question that there is a completed movement and not just a loading into the railroad cars. In the *National Importing* case, supra, there was again no question raised as to the applicability of the term "shipment" to company-owned material.

Neither the dictionaries nor the cases, therefore, support the narrow reading of the word "shipment" which the plaintiff asserts is the correct reading. The treatise writers also offer little support for the plaintiff's position. They are significantly silent on the meaning of the word "shipment." They, too, apparently consider the word is used in the carrier industry in an ordinary, non-technical manner. Bays, Bailments and Carriers (2nd ed.1920); Carver, Carriage of Goods by Sea (10th ed.1957) (English); Chorley & Giles, Shipping law (4th ed.1959) (English); Cushman, Manual of Transportation Law (1951); Gwertzman, Law of Transportation and Relation to Transportation Insurance (1950); Bugan, When Does Title Pass? (2nd ed.1951); Proctor, Authorities and Rights of Interstate Truckers (1958); Watkins, Shippers and Carriers (Fuller ed.1962).

Bugan, supra, says at 243:

> "The word 'ship' or 'shipment' * * has many meanings but is here used to denote the *sending of goods*, as putting them on board a vessel, truck, railroad car, etc." (Emphasis added.)

He does not demand that there be a delivery or a charge in this general definition. The book deals exclusively with contracts with carriers for hire and does not deal with the company material issue which this court confronts.

■ At the trial, the plaintiff offered testimony which supported its contention that the common definition of the word "shipment" includes a charge and a delivery. Its most persuasive witness

was C. G. Jensen, who had spent most of his adult life with the ICC in various executive capacities and had been retired since 1954. He testified that a shipment included delivery to a common carrier who charged for the transportation. Since we have determined that an expert opinion is not necessary, his testimony that this definition was the one commonly accepted by the industry and was the usual meaning attributed to the word must be weighed against the other evidence, and has been so considered by this court. In this connection, it is of importance to refer to a distinction that Mr. Jensen drew. He said that when a regular movement of commercial goods is charged for by a carrier, it is a "shipment." When, as here, there is company material transported, he called it a "movement."

This distinction turned up again, though not quite where the plaintiff wished it to. Plaintiff's Exhibit 5 is a letter from Arthur A. Moser, presently a Freight Traffic Manager for the plaintiff, to Mr. T. Weitzel, Traffic Manager of the defendant. In the second paragraph, the word "movement" is used to refer to transportation of company material. In the last sentence of paragraph 3, however, the term "movement" is used to refer to just the opposite of what the plaintiff is now contending.

Even more telling is what is found in Plaintiff's Exhibit 7. In talking about company material, Mr. Moser writes that "when these cars are *shipped* to Kansas City in deadhead *movement* of other railroads, there is no line haul *transportation* involved." (Emphasis added.) The forbidden word "shipped" is used to refer to company material, as is the word "movement," while another word, "transportation," is used to mean common carrier movement for which charges are assessed.

Defendant's Exhibit 4 appears to complete the confusion. Plaintiff's Exhibits 5 and 7 above were both written in 1961. Defendant's Exhibit 4 was written in October, 1965, shortly before this suit was instituted, and was signed by W. V. Hopkins, plaintiff's Division Freight Agent. It quoted a decision of the plaintiff's General Traffic Department, which gave Santa Fe's final position on the defendant's contention that the reciprocal switching rate applied to carloads of company material from points of origin outside the Kansas City Switching District. The decision read:

"When a railroad transports its own property, it is acting as a private carrier, rather than a common carrier transporting commercial property. Therefore, *shipments* do not become *common carrier movement* until delivered to our line, which has no interest in the property. Thus, in the application of a switch charge, the *shipment* is considered as one originating at Kansas City, Missouri-Kansas, and *terminating* at Erman Corporation, Turner, Kansas, which would be an inter-terminal switch and subject to charges as published in Item of our Tariff 7555–R." (Emphasis added.)

Here we see that the crucial term "shipment" is used to refer to just the opposite of what Santa Fe now urges. The addition of the words "common carrier" to modify "movement" is significant and reminiscent of the *New Mexico Central* case, supra, and others which made the same distinction.

This inquiry into the use of the word "shipment" by the plaintiff in its correspondence has shown that the Santa Fe itself did not use the term in the narrow manner it alleges is proper. In fact, it has substituted the words "movement" and "transportation" to mean the same thing.

■ The plaintiff, of course, is not estopped from asserting what it considers as the correct interpretation of the term, for, as its briefs argue, it could not waive the proper meaning. Louisiana & Arkansas Ry. Co. v. Export Drum, supra. This court, however, is not foreclosed from considering this evidence as indicating that there was a common, everyday, understood meaning of the term and that it was not as narrowly used as plaintiff asserts.

Taking the plaintiff's evidence as favorably as possible, Santa Fe at best has made a showing that the word "shipment" has hidden ambiguities. In this court's opinion, the evidence is overwhelming that the term has been applied to the movements of company material where there has been no charge or delivery by persons other than the employees of the railroad company. On this basis, since the defendant's contention has been shown to be eminently reasonable, the resolution of the term's ambiguities must be against the author of the tariff, who in this case is the plaintiff, Santa Fe. E. g., United States v. Missouri-Kansas-Texas R. Co., 194 F.2d 777 (5th Cir. 1952), (quoted in plaintiff's brief).

It is, therefore, ordered that judgment be and it is hereby rendered for the defendant, with costs.